[No. 21787-6-III. Division Three. January 15, 2004.]

JAMES W. HARBERD, ET AL., *Appellants*, v. THE CITY OF KETTLE FALLS, *Respondent*.

500

*Chris A. Montgomery* (of *Montgomery Law Firm*), for appellants.

*Stephen M. Lamberson* and *Kevin W. Mickey* (of *Etter, McMahon, Lamberson & Clary, P.C.*), for respondent.

BROWN, C.J. — ◼ James and Fumiko Harberd (collectively Mr. Harberd) filed a damages claim against the city of Kettle Falls (City) contending the City reneged on an agreement to let Mr. Harberd hook up his proposed out-of-town housing lots to the City's water system. The trial court granted the City's motion for summary judgment. Mr. Harberd does not renew his injunctive relief arguments here, thus they are abandoned. *State v. Noah*, 103 Wn. App.

29, 41 n.3, 9 P.3d 858 (2000), *review denied*, 143 Wn.2d 1014 (2001). After analyzing remaining issues regarding claim filing, statute of limitations, contract, and estoppel, we affirm.

## FACTS

On August 25, 2000, a process server attempting to serve Mr. Harberd's statutory claim for damages against the City asked Leanne Sanders, Secretary/Clerk for the City's Mayor, if he could see the mayor, or the City Clerk/Treasurer, Raena Skaggs. Upon learning neither was present, the process server served Ms. Sanders.

On March 16, 2001, Mr. Harberd filed a complaint for damages and injunctive relief against the City in the Stevens County Superior Court. The complaint alleged the City breached "an express or implied contract to furnish water hook-ups for future developments" of Mr. Harberd's concerned real property. Clerk's Papers (CP) at 4. The summons and complaint were served on the City's mayor on March 20, 2001.

On July 11, 2002, the City moved for summary judgment dismissal. The City partly argued Mr. Harberd had failed to properly serve his claim for damages because Ms. Sanders was not empowered to accept service of process on behalf of the City pursuant to RCW 35.23.121. The City also contended Mr. Harberd's claim was time barred because he presented no evidence of an oral contract occurring within the three-year statute of limitations pursuant to RCW 4.16.080(3).

The summary judgment record showed in September 1981 that the City imposed a moratorium on out-of-town water hookups until the City upgraded its water system. In April 1983, after the moratorium had ended, Mr. Harberd discussed with the city council (Council) whether he could obtain City water hookups for 5 acres he hoped to develop, out of 103 acres total (Tract I). Mr. Harberd proposed to install a six-inch water line at his own expense with seven

connections running from it. The Council instructed concerned staff to work with Mr. Harberd on arriving at an agreement on such water hookups. In January 1983, the city council approved two water hookups for Tract I. The standard fee for each out-of-town three-quarters-inch water hookup was $1,000.

On January 15, 1985, the city council approved Mr. Harberd's request for two more water hookups, one for Tract I and another for a separate 20-acre parcel. On February 5, Mr. Harberd approached the city council again with a proposal for further development of Tract I. He told the Council Tract I had potential for 35 lots and he already had seven approved hookups. He also told the Council he intended to develop another 50 acres with 38 proposed hookups, including 4 already approved (Tract II). Specifically, Mr. Harberd asked the City for four more hookups for Tract II.

The Council told Mr. Harberd he needed to bring the matter before the Kettle Falls Planning Commission (Planning Commission). Council member Don Pratt told Mr. Harberd a grant of four additional hookups "does not guarantee him any additional hookups in the future." CP at 40. "Mr. Harberd stated he understood that and that he was just requesting to be treated fairly and equitably for his water hookups." CP at 40.

On February 12, 1985, Mr. Harberd outlined his development proposal to the Planning Commission. The Planning Commission recommended Mr. Harberd long plat 15 lots for houses rather than mobile homes.

In June 1988, Mr. Harberd sought city council approval of water hookups for a proposed long plat made up of 30 to 35 lots. Although two Council members expressed concerns about water pressure with that many hookups, the Council approved Mr. Harberd's request. Mr. Harberd requested city council approval of four more hookups in April 1989. One City staff member expressed concern that "the City had over committed on the water hookups and at some point in the near future would have to stop approving

them." CP at 44. Nevertheless, the staff member did not oppose Mr. Harberd's request. The city council approved the new hookups.

With each hookup approval, Mr. Harberd and the City executed a written water service contract pertaining to the served property, which partly provided:

> The second party [Mr. Harberd] further hereby releases the City of Kettle Falls, and holds the city harmless for any liability arising out of any theory of law be it tort, contract, strict liability, warranty, products liability, restitution, or otherwise resulting from the town providing water to the second party or in repairing or maintaining said water line.

CP at 74.

At the May 21, 1991 city council meeting, Mr. Harberd complained he could not get sufficient water pressure for some lots. He requested permission to connect the lots to a nearby City water line. On June 4, 1991, the city council approved a two-inch hookup for Mr. Harberd's lots and assessed a standard fee of $2,600.

In March 1993, the Washington State Department of Health (DOH) informed the City that a recent study "estimated the maximum number of service connections that could be adequately served by your existing system to be 1,400," and that DOH would issue the City an operating permit approved for that number of hookups. CP at 62. As of May 18, 1993, the City had approximately 800 active hookups and had approved another 550 proposed hookups. On June 1, 1993, the City passed a resolution imposing a 90-day moratorium for approval of new hookups. The resolution also instructed the concerned officials and administrators "to reduce the number of approved but not connected water services outside the city limits." CP at 65. The city council later extended the moratorium one more month until September 24, 1993.

On July 20, 1993, the City imposed a requirement that property owners with previously approved, but as yet unconnected, three-quarters-inch water hookups to pay the

$1,000 fee for each hookup within six months, or else the City would nullify the approved hookups. The City notified Mr. Harberd of this new requirement for his 39 approved hookups by letter dated July 22, 1993. At the August 3, 1993 city council meeting, Mr. Harberd asked that the fee be waived for him because he paid to install his own six-inch water line. At the August 17, 1993 meeting, the city council rejected Mr. Harberd's request to extend a six-month deadline for payment of the hookup fees. The city council gave property owners with reserved water hookups until August 31, 1993 to advise the City of their commitment to pay the $1,000 fee.

In April 1994, the city council approved the Planning Commission's recommendation that the City deny Mr. Harberd's request for eight more hookups.

On August 16, 1994, the city council passed an ordinance imposing a moratorium on all out-of-town water hookups except "those water hookups guaranteed by payment, a signed contract and/or recorded with the county." CP at 68. The length of the moratorium was to "be until such time that necessary action can be taken to update the city water system and construction to accomplish the update construction has begun, and no further request will be honored or considered." CP at 68.

In October 1995, the City denied Clay Young's request for two out-of-town water hookups on the basis of the moratorium. "Clay's request will be added to the list and he will be notified when the moratorium is lifted." CP at 894.

At the April 15, 1997 meeting, the city council voted "to discontinue taking applications for out of town water hookups." CP at 52. With regard to already approved hookups, the Council meeting minutes state:

> It was recommended we satisfy our current paid out of town water hookups and what is currently on the list that is in our Urban Growth Area. It was recommended the city refund the $10.00 for applications already received for hookups outside the Urban Growth Area. City Attorney Charlie Schuerman will look at this and give a recommendation on what can be done.

CP at 52.

In May 1997, the Kettle Falls Area Planning Committee (Planning Committee) recommended the City approve dividing one existing one-inch hookup into two three-quarters-inch hookups for a parcel owned by Harold Monette. And the Planning Committee approved an increase from four hookups to five for a parcel owned by Bob Jones.

In November 1997, the City adopted a comprehensive growth management plan (1997 Comprehensive Plan). Pursuant to the Growth Management Act of 1990, chapter 36.70A RCW, the 1997 Comprehensive Plan included a set of goals and policies for capital facilities and utilities. Regarding water systems, Policy 1.3 states:

> City services will not be extended outside of the city limits unless these areas are first annexed to the City. In the case of the water system, new hookups within the existing service area but outside of the Urban Growth Area will be subject to the following policies:
>
> a) Existing commitments for water will be honored under the terms of the existing contracts.
>
> b) The City will establish a reserve of water capacity for the use of undeveloped property within the City and within the Urban Growth Area. New water service outside of the City or Urban Growth Area but within the existing water service area, will be permitted only in the case of a health emergency (e.g., a contaminated well) and only when excess capacity exists above both current use and these reserves. The applicant shall bear all costs associated with demonstrating that a health emergency exists and no other source of water is available.
>
> c) Property owners must agree to annexation to the City at such time that the City deems it reasonable and desirable.
>
> This policy should be implemented through a separate and more detailed water service ordinance.

CP at 215. Mr. Harberd's property subject to this dispute lies outside the City's urban growth area.

On January 19, 1999, Jim Giesler asked the city council to approve a water hookup for his real property. The mayor

informed Mr. Giesler the City could not approve his request because his property lies outside the City's urban growth area. Later, in response to a citizen question, the mayor stated that "no more out of town hook-ups will be granted." CP at 234.

In September 2001, Dan Leighton and Kelly Keenan sent the mayor a letter requesting six water hookups for lots bordering the City's growth management area. The mayor replied with a letter denying the request, based on the City's moratorium on water hookups outside the City. The mayor further explained that when the moratorium ended, the City would probably give priority to property within the urban growth area.

At the December 20, 2002 summary judgment hearing, the trial court reasoned Mr. Harberd failed to present sufficient evidence as to the existence of an express or implied contract and had failed to present sufficient evidence that the City had voluntarily taken on the role of public utility. Accordingly, the trial court granted summary judgment to the City. On January 22, 2003, the superior court entered an order granting the City's summary judgment motion and dismissing Mr. Harberd's suit. Mr. Harberd appealed.

## STANDARD OF REVIEW

Review of a summary judgment is de novo. *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 92, 993 P.2d 259 (2000). This court engages in the same inquiry as the trial court. *Id.* "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* at 93 (citing *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993); CR 56(c)). This court considers the facts and all reasonable inferences from the facts in the light most favorable to the nonmoving party. *Trimble*, 140 Wn.2d at 93; *Clements*, 121 Wn.2d at 249. If reasonable minds could reach but one conclusion from all the evidence, summary

judgment is correct. *Trimble*, 140 Wn.2d at 93; *Clements*, 121 Wn.2d at 249. "However, bare assertions that a genuine material issue exists will not defeat a summary judgment motion in the absence of actual evidence." *Trimble*, 140 Wn.2d at 93 (citing *White v. State*, 131 Wn.2d 1, 9, 929 P.2d 396 (1997)).

## ANALYSIS

### A. Service of Claim Against City

■ The issue is whether Mr. Harberd's suit is barred by his failure to properly serve the City with his claim for damages. Although the City pleaded this theory below, the trial court did not address it. We can affirm the trial court on any alternative basis supported by the record and the pleadings even if the trial court did not consider that alternative. *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989).

This issue turns on application of the claim filing statutes, RCW 4.96.010 and .020. The more general of the two statutes partly states:

All local governmental entities, whether acting in a governmental or proprietary capacity, shall be liable for damages arising out of their tortious conduct, or the tortious conduct of their past or present officers, employees, or volunteers while performing or in good faith purporting to perform their official duties, to the same extent as if they were a private person or corporation. Filing a claim for damages within the time allowed by law shall be a condition precedent to the commencement of any action claiming damages. . . .

RCW 4.96.010(1).

The other statute, which sets forth specific content and procedural requirements, partly stated at the relevant time:

(1) The provisions of this section apply to claims for damages against all local governmental entities.

(2) All claims for damages against any such entity for damages shall be presented to and filed with the governing body thereof within the applicable period of limitations within which an action must be commenced.

(3) All claims for damages arising out of tortious conduct must locate and describe the conduct and circumstances which brought about the injury or damage, describe the injury or damage, state the time and place the injury or damage occurred, state the names of all persons involved, if known, and shall contain the amount of damages claimed, together with a statement of the actual residence of the claimant at the time of presenting and filing the claim and for a period of six months immediately prior to the time the claim arose. . . .

(4) No action shall be commenced against any local governmental entity for damages arising out of tortious conduct until sixty days have elapsed after the claim has first been presented to and filed with the governing body thereof. The applicable period of limitations within which an action must be commenced shall be tolled during the sixty-day period.

Former RCW 4.96.020 (1993).

Mr. Harberd contends the claim filing statutes do not apply to nontort claims, such as breach of contract. The City contends otherwise, noting changes in the wording of the statute.

■ Generally, we strive to interpret a statute "to best advance" the underlying legislative purpose. *State v. C.J.*, 148 Wn.2d 672, 685, 63 P.3d 765 (2003) (citing *Morris v. Blaker*, 118 Wn.2d 133, 143, 821 P.2d 482 (1992)). We begin with a plain meaning interpretation of the language on the face of the statute and closely related statutes in light of the underlying legislative purpose. *See Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d 462 (2003); *Wagg v. Estate of Dunham*, 146 Wn.2d 63, 73, 42 P.3d 968 (2002); *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). Moreover, we interpret the statute in its entirety, reading all of its provisions in relation to each other. *In re Det. of Williams*, 147 Wn.2d 476, 490, 55 P.3d 597 (2002).

■ These statutes apply the term "damages" in two different ways. Three references exist to "damages" without any qualifying language. RCW 4.96.010(1); former RCW 4.96.020(1), (2). Then three references exist to "damages arising out of [their] tortious conduct." RCW 4.96.010(1); former RCW 4.96.020(3), (4). The plain language of the statutes read in their entirety reflect a legislative intent that some general requirements apply to all damages claims while some more specific requirements apply solely to claims arising out of tortious conduct.

Accordingly, any person asserting a claim of damages must first file a claim of damages. RCW 4.96.010(1). "All claims for damages . . . shall be presented to and filed with" the concerned governmental entity. Former RCW 4.96.020(2). If the claimant alleges "damages arising out of tortious conduct," the damages claim must set forth specific facts outlined in the statute. Former RCW 4.96.020(3). And if the claimant alleges "damages arising out of tortious conduct," the claimant may not commence a court action "until sixty days have elapsed after the claim has first been presented to and filed with" the concerned governmental entity. Former RCW 4.96.020(4). While awkward, the foregoing reflects the plain meaning of the statute and we assume the statute means exactly what it says. *Morgan v. Johnson*, 137 Wn.2d 887, 890-91, 976 P.2d 619 (1999). The plain meaning supports the City's argument that the applicable claim filing provisions apply to both tort and breach of contract claims.

In any event, some ambiguity exists in former RCW 4.96.020(1), which states "[t]he provisions of this section apply to claims for damages against all local governmental entities." Two subsequent subsections apply solely to damages arising out of tortious conduct. Former RCW 4.96-.020(3), (4). Some discussion of the historical changes to the claim filing statutes is appropriate. *See Kilian v. Atkinson*, 147 Wn.2d 16, 21, 50 P.3d 638 (2002) (noting that appellate court may resort to principles of statutory construction, such as legislative history and relevant case law in construing ambiguous statute).

In a case interpreting a previous claim statute applicable to counties, the Supreme Court held that the term "damages" alone "means the sum of money which the law imposes or awards as compensation, or recompense, or in satisfaction for an injury done, or a wrong sustained as a consequence, either of a breach of a contractual obligation or a tortious act or omission." *Puget Constr. Co. v. Pierce County*, 64 Wn.2d 453, 457, 392 P.2d 227 (1964) (citing 15 AM. JUR. *Damages* § 2).

In 1967, the legislature enacted the first versions of RCW 4.96.010 and .020. *See El Coba Co. Dormitories v. Franklin County Pub. Util. Dist.*, 82 Wn.2d 858, 861, 514 P.2d 524 (1973); LAWS OF 1967, ch. 164. This first version of RCW 4.96.020 did not apply to cities, towns, or counties. LAWS OF 1967, ch. 164, § 4(2); *see also El Coba Co. Dormitories*, 82 Wn.2d at 862. And the new statutes applied solely to damages arising out of tortious conduct. *Id.* The Supreme Court noted this change in language and reasoned:

> [I]n 1967, when the legislature enacted chapter 164, it is presumed to have known that this court had construed the word "damages", as used in a prior claims statute, to mean damages arising from either tort or breach of contract. Nonetheless, section 4(2) of chapter 164 [former RCW 4.96.020] does not require claims to be filed for "damages", as in the earlier statute, but requires claims only for "damages arising out of tortious conduct". The requirement of filing a claim for damages arising out of alleged breach of contract is thus eliminated.

*El Coba Co. Dormitories*, 82 Wn.2d at 863.

In 1993, the legislature enacted new versions of the claim filing statutes applicable when Mr. Harberd asserted his claim. LAWS OF 1993, ch. 449. These new versions removed references to "tortious conduct" that appeared in previous versions of the statutes. *Id.* The operative language of the new RCW 4.96.020 broadened applicability to "all governmental agencies." Former RCW 4.96.020(1).

As the Supreme Court previously noted, the legislature was presumably aware of the court's previous interpreta-

tions of the claim filing statutes when it amended the claim filing statutes in 1993. *See El Coba Co. Dormitories*, 82 Wn.2d at 862-63. By using the general term "damages" and the more specific term "damages arising out of tortious conduct" in different sections of the statutes, the legislature presumably meant to distinguish the two. In other words, when the legislature returned to the term "damages" alone, its intent was to revert to the Supreme Court's definition of damages that encompasses both tort and breach of contract claims. Consequently, this legislative history further supports the City's argument.

In sum, the claim filing statutes required Mr. Harberd to file his claim for damages with the City before he filed his lawsuit for breach of contract. Next, we discuss whether Ms. Sanders was authorized to accept service of damages claims.

▮▮ The parties are in general agreement that City Clerk/Treasurer Ms. Skaggs was the person formally authorized to accept service of damages claims. RCW 35.23.121. The city clerk may appoint a deputy for purposes of accepting service. *Id.* Below, Mr. Harberd consistently argued that whoever accepted service of the damages claim was irrelevant because filing of such a claim was unnecessary. Now, Mr. Harberd contends, for the first time in his reply brief here, that service was proper because Ms. Sanders was in fact the deputy city clerk. "An issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (citing *In re Marriage of Sacco*, 114 Wn.2d 1, 5, 784 P.2d 1266 (1990)).

In any event, no evidence shows Ms. Sanders was appointed deputy to Ms. Skaggs. Ms. Sanders did not allege so in her affidavit. No other affidavits in the record state Ms. Sanders was Ms. Skaggs' deputy. Ms. Sanders did sign the 1995 water services contract between Mr. Harberd and the City in her capacity as "Secretary/Clerk" to the mayor, but not as city clerk. CP at 199. In sum, Mr. Harberd failed to

raise a reasonable inference that he properly served his claim for damages.

A claimant must adhere strictly to the filing requirements of RCW 4.96.020. *Medina v. Pub. Util. Dist. No. 1 of Benton County*, 147 Wn.2d 303, 316, 53 P.3d 993 (2002). Dismissal is proper where a claimant fails to comply strictly with filing requirements of RCW 4.96.020. *Sievers v. City of Mountlake Terrace*, 97 Wn. App. 181, 183, 983 P.2d 1127 (1999). "This court is obliged to give full effect to the plain language of the statute even when the results of doing so may seem unduly harsh." *Id.* (citing *Geschwind v. Flanagan*, 121 Wn.2d 833, 841, 854 P.2d 1061 (1993)). The record and pleadings show it would have been proper to dismiss Mr. Harberd's suit for failure to comply strictly with RCW 4.96.020.

## B. Statute of Limitations

The issue is whether Mr. Harberd's claim is time barred. While the trial court did not address this issue, we discuss it as an alternative basis for affirming summary judgment. *LaMon*, 112 Wn.2d at 200-01.

First, Mr. Harberd contends no statute of limitations exists on the issue of whether the City is a public utility. However, Mr. Harberd's objective was to establish the City's public utility status to support his breach of contract claim. Consequently, Mr. Harberd asserts a breach of contract claim subject to the three-year statute of limitations for actions arising from unwritten contracts. RCW 4.16.080(3).

Mr. Harberd contends vaguely in his affidavit that Ms. Sanders and the mayor told him for the first time in December 1999 that the City would no longer grant him out-of-town water hookups. Nothing in the documentary record verifies this bald claim. Mr. Harberd's assertion is really nothing more than self-serving hearsay and conclusory assertion, insufficient to raise a genuine issue of material

fact. *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 643-44, 618 P.2d 96 (1980).

The documentary record does not reflect any formal applications by Mr. Harberd for out-of-town water hookups after April 1994. At that time, the City denied a request for eight more hookups, and Mr. Harberd never challenged that adverse decision.

The City executed its last water service contract with Mr. Harberd in July 1995. The City had already imposed an open-ended moratorium on out-of-town hookups in August 1994. Mr. Harberd took no action in response to the moratorium.

While the 1994 moratorium was still in effect, the City enacted a new Comprehensive Plan in November 1997. The 1997 Comprehensive Plan generally prohibited extension of the City's water services outside the City limits. Again, Mr. Harberd took no action in response to the City's adoption of the 1997 Comprehensive Plan. And the record reflects no attempt by him to apply for new water hookups. In sum, the record does not reflect an adverse City decision specifically directed at Mr. Harberd's desired water hookups after 1994.

In any event, reasonable minds could reach one conclusion, that Mr. Harberd was on constructive notice no later than November 1997 that the City would no longer grant out-of-town water hookups. Given the constructive notice, and the lack of credible evidence of any adverse City decisions after that time, Mr. Harberd's March 16, 2001 breach of contract claim has to be time barred.

## C. Waiver

The City asserts we should consider whether the waiver provisions in water service contracts signed in 1982, 1985, and 1995 bar the claims presently before this court. We conclude the waivers contained in the individual water service contracts are irrelevant to the claims at issue here. First, the contracts pertain solely to water service provided to specific lots not at issue here. Second, the waiver lan-

guage pertains to any claims arising from the City "providing" water to Mr. Harberd. The waiver language clearly contemplates issues such as water contamination and damage to the affected lots. Here, the issue is entirely different; the City follows a policy that prevents service of water to a number of Mr. Harberd's lots. Accordingly, the waiver clauses in the water service contracts do not apply to this case.

## D. Implied Contract

The issue is whether the City breached an implied contract with a public utility to supply Mr. Harberd's lots with water. Our focus is whether the City was in fact a public utility obligated to provide water and sewer service to land owners in its service area.

Municipalities have statutory authority to contract with landowners for water and sewer services as partly stated in the following provision:

> The governing body of any city, town, county, water-sewer district, or drainage district, hereinafter referred to as a "municipality" may contract with owners of real estate for the construction of storm, sanitary, or combination sewers, pumping stations, and disposal plants, water mains, hydrants, reservoirs, or appurtenances, hereinafter called "water or sewer facilities," within their boundaries or (except for counties) within ten miles from their corporate limits connecting with the public water or sewerage system to serve the area in which the real estate of such owners is located.

RCW 35.91.020.

The statute permits a municipality to supply water and sewer services "beyond its corporate limits within a 10-mile radius." *Brookens v. City of Yakima*, 15 Wn. App. 464, 465, 550 P.2d 30 (1976) (citing RCW 35.91.020). "The power to supply water beyond corporate limits is permissive, with supply being a matter of contract between the municipality and property owners." *Brookens*, 15 Wn. App. at 465-66 (citing *Town of Steilacoom v. Thompson*, 69 Wn.2d 705,

707-08, 419 P.2d 989 (1966)). "In the absence of contract, express or implied, a municipality cannot be compelled to supply water outside its corporate limits." *Brookens*, 15 Wn. App. at 466. "[A] city has no duty to extend sewer service beyond its borders." *Yakima County Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 381, 858 P.2d 245 (1993).

 Here, no evidence exists of express contracts concerning the affected property. The existing water service contracts apply solely to enumerated lots. *See Brookens*, 15 Wn. App. at 466. On this matter, *Brookens* is directly on point: "These contracts fail to create an express agreement for the supply of the entire tract. Nor does the record contain evidence of an express agreement to serve indiscriminately the general area in which the tract is located, which is a common contractual situation envisioned by RCW 35.91.020." *Brookens*, 15 Wn. App. at 466 (footnote omitted). Thus, our case turns on whether an implied contract existed. *See id.* at 466-67.

 Generally, "[a]n implied contract comes about when through a course of dealing and common understanding, the parties show a mutual intent to contract with each other." *Irvin Water Dist. No. 6 v. Jackson P'ship*, 109 Wn. App. 113, 122, 34 P.3d 840 (2001), *review denied*, 147 Wn.2d 1003 (2002). "A contract to supply water may also be found by implication, as where a municipality holds itself out as a public utility willing to supply all those who request service in a general area." *Brookens*, 15 Wn. App. at 466 (citing *City of Milwaukee v. Pub. Serv. Comm'n*, 268 Wis. 116, 66 N.W.2d 716, 721 (1954)).

In the municipal water context, the existence of an implied contract depends on whether the evidence shows the municipality acted in a manner that implied "a general offer to supply any and all landowners," or the complaining landowner individually. *Brookens*, 15 Wn. App. at 466-67. The mere presence or absence of a water main in front of the concerned property does not control the analysis. *Id.* at 467.

Similarly, a municipality may be under a general duty to provide water and sewer services where it "is the exclusive supplier of sewer or water service in a region extending beyond the borders of the city." *Yakima County Fire Prot. Dist. No. 12*, 122 Wn.2d at 382 (citing *Barbaccia v. County of Santa Clara*, 451 F. Supp. 260, 264 n.2 (N.D. Cal. 1978)). But that duty is not absolute; the municipality may properly deny water or sewer services if it lacks the needed capacity. *Yakima County Fire Prot. Dist. No. 12*, 122 Wn.2d at 382; *Barbaccia*, 451 F. Supp. at 264 n.2.

Mr. Harberd relies mainly on *Nolte v. City of Olympia*, 96 Wn. App. 944, 982 P.2d 659 (1999), to argue the City was the exclusive supplier of water and sewer services to his area. But, *Nolte* is distinguishable for a number of reasons.

First, Olympia "admitted that it was the sole provider of water and sewer service to the" affected area. *Id.* at 949. Here, the City denies it is the exclusive provider.

Second, Olympia and the complaining landowner executed an express agreement for utilities. *Id.* Their dispute revolved around the payment of impact fees. *Id.* Here, no express agreement exists; the controversy centers on an entirely different matter, whether an implied contract exists for water and sewer services.

Third, although the *Nolte* court recognized a municipality has a general duty to supply water and sewer service when it is the exclusive provider to a defined area, such service is "subject to such reasonable conditions, if any, as the law may allow." *Id.* at 958; *see also Yakima County Fire Prot. Dist. No. 12*, 122 Wn.2d at 381-82.

In light of the foregoing, *Nolte* is of little persuasive effect.

Here, the record shows the City historically retained discretion to grant or deny water hookups. While the record shows the City granted far more hookups than denied them, the record does not show the City held itself out to be the exclusive supplier of a defined area outside its corporate borders.

 Mr. Harberd alleges his property lies within a school district falling within the jurisdiction of the Kettle Falls Area Planning Committee. If true, the property's location within the school district, but outside the City's corporate boundaries, does not raise a genuine issue of material fact as to whether the City was under a contractual duty to provide water and sewer services to that property.

Mr. Harberd contends the City required him to develop his lots in a specific order, thus evidencing its intent to include the properties within the City's water system. But the record does not contain evidence of supporting directives by the City. Mr. Harberd's conclusory assertions and bare allegations are insufficient to raise a genuine issue of material fact. *LaMon v. Butler*, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989).

Mr. Harberd points to a portion of the 1984 Kettle Falls Planning Area Comprehensive Land Use and Traffic Circulation Plan (1984 Comprehensive Plan), which partly states, "Public water service within the City of Kettle Falls water district shall be provided by one municipal entity and shall be consistent with a master water plan." CP at 569. Mr. Harberd, alleging his property falls within the Kettle Falls water district, contends this language indicates the City's intent to be the sole supplier of water and sewer services. But, Mr. Harberd apparently misinterprets the quoted language. Interpreted correctly, the 1984 Comprehensive Plan means public water service, if provided, will be by one municipal entity. That is not the same as saying all water services within the water district must be provided by the city entity. Moreover, the same plan stated the City and County reserved the right "to prohibit or set conditions on development based on anticipated adverse environmental impacts." CP at 569.

 Changing environmental conditions and enactment of the Growth Management Act, chapter 36.70A RCW, led to the City's promulgation and adoption of the 1997 Comprehensive Plan, which "updated" the previous plan and thus impliedly superseded it. CP at 208. Stated another way,

when both the 1984 and 1997 plans are read together, it becomes apparent the latter plan was intended to take the place of the former. *See State ex rel. Allen v. Public Serv. Comm'n*, 111 Wash. 294, 296, 190 P. 1012 (1920). And the 1997 Comprehensive Plan forecloses new out-of-town water hookups. Accordingly, Mr. Harberd's contention that the 1984 Comprehensive Plan controls is unpersuasive.

 Mr. Harberd also unpersuasively argues the City failed to enact specific ordinances authorized by the 1997 Comprehensive Plan. But the language in the 1997 Comprehensive Plan that it "should" be implemented through subsequent ordinances is advisory or permissive, not imperative. Mr. Harberd offers no authorities holding the City's failure to enact new ordinances renders the 1997 Comprehensive Plan without effect.

In any event, the record clearly evidences the City cannot supply the desired water. The State Department of Ecology guided the City to impose the 1994 water hookup moratorium. That moratorium is still in effect, and the 1997 Comprehensive Plan further reinforced that future out-of-town water hookups were not possible absent annexation and increased capacity. Even if the City could be characterized as the sole source of water in the area encompassing Mr. Harberd's lots, the lack of capacity forecloses his claim of damages. *See Barbaccia*, 451 F. Supp. at 264 n.2.

In light of the foregoing, we hold the trial court did not err in concluding Mr. Harberd failed to raise genuine issues of material fact in support of his claims.

E. Estoppel

The issue is whether the City was estopped from denying water hookups to Mr. Harberd. Mr. Harberd relies upon promissory estoppel, but the City argues neither promissory estoppel nor equitable estoppel apply.

 Equitable estoppel is properly applied " 'as a "shield" or defense, while promissory estoppel can be used as a "sword" in a cause of action for damages.' " *State ex rel.*

*D.R.M. v. Wood*, 109 Wn. App. 182, 196, 34 P.3d 887 (2001) (quoting *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 259, 616 P.2d 644 (1980)). "[P]romissory estoppel requires the existence of a promise." *Klinke*, 94 Wn.2d at 258 (citing *Hellbaum v. Burwell & Morford*, 1 Wn. App. 694, 700, 463 P.2d 225 (1969); Robert A. Brazener, Annotation, *Promissory Estoppel as Basis for Avoidance of Statute of Frauds*, 56 A.L.R.3d 1037, 1042 (1974)). Here, our analysis turns on promissory estoppel.

The elements of promissory estoppel are the following:

> (1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.

*Corbit v. J. I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967).

Here, no direct evidence of a promise exists on the part of the City establishing it would always provide water services to all of Mr. Harberd's lots. Moreover, viewing the entire record in a light most favorable to Mr. Harberd fails to raise a reasonable inference that the City made such a promise. Further, Mr. Harberd undermines his own affidavits by relying greatly on bald hearsay, which is not competent evidence for summary judgment purposes. *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 643-44, 618 P.2d 96 (1980).

Additionally, Mr. Harberd's broad claim that the development pattern of his property reflects a promise by the City to supply water requires a logical leap unsupported by any competent evidence. *LaMon*, 112 Wn.2d at 197. And while the post hoc affidavit of former city council member Mr. Pratt is sympathetic to Mr. Harberd, the affidavit is not competent evidence of the city council's intent at the relevant times. *See City of Yakima v. Int'l Ass'n of Firefighters AFL-CIO, Local 469*, 117 Wn.2d 655, 677, 818 P.2d 1076 (1991) (noting affidavits of legislators are not admissible evidence of legislative intent).

In sum, Mr. Harberd fails to raise a genuine issue of material fact as to the first element of promissory estoppel. Accordingly, his estoppel claim fails.

Affirmed.

SWEENEY and KURTZ, JJ., concur.

Review denied at 152 Wn.2d 1025 (2004).