[No. 78449-3.   En Banc.]
Argued November 14, 2006.     Decided August 2, 2007.

DORIS BURNS ET AL., *Individually and on Behalf of the Class of All Persons Similarly Situated, Appellants,* v. THE CITY OF SEATTLE ET AL., *Respondents.*

---

[27] *Richardson v. Ramirez*, 418 U.S. 24, 83, 94 S. Ct. 2655, 41 L. Ed. 2d 551 (1974) (Marshall, J., dissenting).

132

*David F. Jurca, Connie K. Haslam,* and *Colette M. Kostelec* (of *Helsell Fetterman, LLP*), for appellants.

*Thomas A. Carr, Seattle City Attorney,* and *Robert W. Cromwell, Jr.,* and *Suzanne L. Smith, Assistants; William H. Patton* (of *Foster Pepper, PLLC*); *Ian R. Sievers, Shoreline City Attorney; Shelley M. Kerslake* (of *Kenyon Disend, PLLC*); *Michael P. Ruark* (of *Inslee, Best, Doezie & Ryder, PS*); *Mary E. Mirante Bartolo, SeaTac City Attorney,* and *Mark S. Johnsen, Senior Assistant;* and *Donald S. Cohen* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, LLP*), for respondents.

*Anne L. Spangler* on behalf of City of Tacoma, amicus curiae.

*Wayne D. Tanaka* on behalf of City of University Place and City of Lakewood, amici curiae.

¶1 MADSEN, J. — Seattle City Light (SCL) entered into franchise agreements with the cities of Shoreline, Burien, Lake Forest Park, SeaTac, and Tukwila (Cities). At issue in this case is the validity of a contractual provision common to each of the agreements, whereby SCL agreed to pay a percentage of revenues received from the Cities' power

customers in exchange for the Cities' promise to forbear from establishing their own municipal electric utilities. The petitioners, representing a class of SCL ratepayers, contend that the payment provision violates RCW 35.21.860(1), which in relevant part provides that "[n]o city or town may impose a franchise fee or any other fee or charge of whatever nature or description upon the light and power . . . distribution business[ ]." We hold that the contractual payment provision does not fall within the statutory prohibition because the Cities did not exact the payments through their governmental powers of taxation and regulation. Rather, acting in a proprietary capacity, the Cities negotiated the payment provision as consideration for a special benefit conferred on SCL independent from the privilege of operating a franchise. We affirm the summary judgment order dismissing the action.

## FACTS

¶2 SCL is a municipal electric utility that serves customers both within and without city limits. In the early 1990s, several of the suburban areas served by SCL incorporated, including Shoreline, Burien, and SeaTac. Lake Forest Park incorporated in 1961. Prior to the negotiation of the franchise agreements at issue here, SCL served these areas either without a franchise agreement or under an agreement with King County to serve certain unincorporated areas. SCL has operated under a franchise agreement with the city of Tukwila since 1958.

¶3 Upon incorporation, the Cities gained the authority to grant a franchise to SCL or another utility. RCW 35A.47.040. The Cities also gained the authority to form their own municipal electric utilities. RCW 35.92.050. Shoreline hired a consultant to help it explore its options. The city of Tukwila, whose franchise agreement with SCL would expire in 2008, entered into discussions with Burien and a number of other cities in south King County concerning the feasibility of forming a joint municipal utility.

Several of the cities had concerns about the rates and services provided by SCL and viewed municipalization of the electric utility as a means of gaining greater control over these issues.

¶4 Municipalities may impose a six percent utility tax for the privilege of conducting a power distribution business. RCW 35.21.870. The city of Seattle imposes such a tax on SCL's gross revenues, including revenues received from its suburban utility customers. However, SCL has taken the position that the Cities may not impose such a tax on another municipality's electric utility. The Cities' ability to impose a utility tax on SCL is clouded by legal uncertainty. The Cities were concerned that the utility tax paid by SCL customers supports only Seattle's general fund, not their own. The availability of utility tax revenue was a significant concern of the Cities as they considered whether to grant SCL a franchise or, alternately, whether to grant a franchise to a private utility or form a municipal utility.

¶5 The city of Shoreline sought legislation that would have required Seattle to grant a tax credit to SCL's suburban customers for any utility taxes imposed by the city in which the customers resided. H.B. 2708, 55th Leg., Reg. Sess. (Wash. 1998). The Bill Analysis explained that the purpose of the legislation was to avoid double taxation of municipal utility taxes, which could occur when a municipal electric utility provides services outside its city limits. HOUSE COMM. ON FINANCE, H.B. REP. on Substitute H.B. 2709, 55th Leg., Reg. Sess. (Wash. 1998). The proposed legislation prompted SCL and Seattle to accelerate negotiations with the Cities. SCL wanted to secure its ratepayer base while at the same time preserving Seattle's ability to generate revenue for its general fund through the utility tax.

¶6 SCL was concerned that a shrinking rate base would impair its ability to provide low rates and efficient service. A stable ratepayer base is important to avoid "stranded costs," to secure more favorable bond ratings, and to obtain a better wholesale rate for power purchases. In addition, the size of SCL's ratepayer base could be a significant factor

in SCL's ability to renew its federal license to operate the Boundary Dam, which expires in 2011. The amount of power that federal licensing authorities authorize SCL to extract from the dam will depend, in part, on the size of the ratepayer base.

¶7 At the same time a number of suburban areas served by SCL incorporated, deregulation of the industry became a significant issue for the utility. Deregulation involves the uncoupling of the three primary elements of the electrical industry: the generation, transmission, and distribution of electrical energy. *See Cal. ex rel. Lockyer v. Fed. Energy Regulatory Comm'n*, 383 F.3d 1006 (9th Cir. 2004) (explaining principles in context of California's deregulation of the power industry), *cert. denied*, 127 S. Ct. 2972 (2007). Under deregulation, retail customers could purchase power from different providers, while SCL would retain a monopoly on the distribution portion of its business only. The twin prospects of deregulation and competition from suburban utilities created a climate of considerable uncertainty for SCL.

¶8 Accordingly, SCL entered into negotiations with the Cities in order to "stabilize its long-term power interests in a deregulated environment." Clerk's Papers (CP) at 1118 (deposition transcript of the former SCL superintendent, Gary Eugene Zarker). Each of the Cities granted SCL a nonexclusive franchise for the operation of an electric utility within the right-of-way. Each of the franchise agreements is embodied in a city ordinance adopted by the respective city government. The franchise agreements provide that SCL shall pay the Cities six percent of the revenues derived from retail power sales to city residents in consideration for the Cities' agreement not to exercise their authority to establish a competing municipal electric utility for the duration of the franchise. SCL further agreed to recover the six percent payment system-wide, rather than surcharging the Cities' utility customers. In addition, SCL agreed that any rate differential for customers served outside the Seattle city limits would not exceed eight

percent. The contractual payment provision, which is substantially the same for each of the contracting cities, provides:

4. <u>Consideration.</u> It is recognized by the City and by SCL that the City has the authority to establish its own municipal electric utility, and the authority to acquire SCL electric distribution properties in the City for that purpose.

4.1[.] In consideration for the City agreeing not to exercise such authority during the term of this franchise, SCL agrees to the following:

4.1.1. SCL shall pay the City six percent of the amount of revenue derived from the power portion of SCL service to customers in the City, and shall pay the City zero percent of the amount of revenue derived from the distribution portion of SCL service to customers in the City.

4.1.2. SCL shall not include any part of the power portion of the payment to the City provided in <u>Section 4.1.1.</u> above as a component of any rate differential between customers served by SCL in the City and customers served by SCL in other jurisdictions.

4.1.3. SCL shall not charge greater than an eight percent differential in the power portion of the rates to customers in the City compared to the power portion of the rates charged to similar customers in the City of Seattle.

CP at 651.

¶9 SCL entered into a franchise agreement with Shoreline in 1999. The Shoreline agreement became a model for similar agreements with the other cities. Tukwila was the last to negotiate a franchise agreement, which replaced an existing franchise agreement set to expire in 2008. SCL has sent the payments to the cities. Billing correspondence and other administrative documentation refers to the payments as "franchise fees." SCL treats the payments as an operating expense and factors the expense into the rates charged to all of its customers. In exchange, the Cities have not formed their own electric utilities.

¶10 On July 27, 2005, the petitioners filed a complaint against the Cities on behalf of themselves and the class of similarly situated persons, seeking declaratory, injunctive, and equitable relief. The petitioners alleged that SCL's payments to the Cities are unlawful under RCW 35.21.860(1), which provides, in relevant part, that "[n]o city or town may impose a franchise fee or any other fee or charge of whatever nature or description upon the light and power, or gas distribution businesses . . . except . . . (b) [to] recover[ ] actual administrative expenses incurred by a city or town."[1]

¶11 The petitioners moved for class certification of all SCL ratepayers, whether residing within or without the Seattle city limits. The trial court certified the case as a class action on behalf of SCL ratepayers who reside in Seattle but excluded the class of SCL ratepayers residing outside the city limits.

¶12 The petitioners moved for partial summary judgment (1) declaring that the payments made are illegal and that the contractual provision is void and unenforceable and (2) enjoining SCL from making any further payments. The respondents cross-moved for summary judgment dismissing the ratepayers' claims in their entirety. The trial court denied the petitioners' summary judgment motion and granted the respondents' summary judgment motion. We granted direct review. The cities of Tacoma, University Place, and Lakewood filed amicus briefs in support of SCL and the Cities.

ANALYSIS

¶13 The principal issue in this case is whether SCL's contractual agreement to pay the Cities six percent of its revenues from the Cities' utility customers is prohibited by RCW 35.21.860(1), which provides, in part:

---

[1] The petitioners further alleged that the payments violate the local government accounting statute, RCW 43.09.210, and constitute an unconstitutional tax. These issues are not before us.

No city or town may impose a franchise fee or any other fee or charge of whatever nature or description upon the light and power, or gas distribution businesses, as defined in RCW 82.16-.010,[2] or telephone business, as defined in RCW 82.04.065, or service provider for use of the right of way.

¶14 We review questions of statutory interpretation de novo. *Okeson v. City of Seattle*, 150 Wn.2d 540, 549, 78 P.3d 1279 (2003). Our goal in statutory interpretation is to effectuate the legislature's intent. *In re Parentage of J.M.K.*, 155 Wn.2d 374, 387, 119 P.3d 840 (2005). When the meaning of a statute is plain, we give effect to that plain meaning as an expression of legislative intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Plain meaning is discerned from viewing the words of a particular provision in the context of the statute in which they are found, together with related statutory provisions, and the statutory scheme as a whole. *Id.* at 11.

¶15 Both parties assert that the statute here is unambiguous. The ratepayers contend that the statute plainly forbids a city from receiving any payment from a franchisee that does not come within the enumerated exceptions. Focusing on the word "impose," the Cities respond that the statute forbids a unilateral or coercive exaction, but not a voluntary agreement to pay a fee.

¶16 The parties offer dueling dictionary definitions in support of their respective positions. The petitioners rely on *Webster's Third New International Dictionary*, which defines "impose" as "to make, frame, or apply (as a charge, tax, obligation, rule, penalty) as compulsory, obligatory, or enforceable." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1136 (2002). They contend that this definition encompasses a contractual provision enforceable by contract as well as by superior or unilateral force. The Cities, in turn, offer *Black's Law Dictionary* as the pertinent source, which defines

---

[2] The "[l]ight and power business" means the business of operating a plant or system for the generation, production, or distribution of electrical energy for hire or sale and/or for the wheeling of electricity for others. RCW 82.16.010(5).

"impose" as "[t]o levy or exact (a tax or duty)." BLACK'S LAW DICTIONARY 771 (8th ed. 2004).

¶17 This court had occasion to interpret the term "imposed" in *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 11 P.3d 762, 27 P.3d 608 (2000). That case involved the constitutionality of Initiative 695, which provided, in part, that " '[a]ny tax increase imposed by the state shall require voter approval.' " *Id.* at 193 (alteration in original). The initiative broadly defined "tax" to include not only a "traditional tax" but also license fees, user fees, and diverse other charges. *Id.* at 218-19. Various government entities sought a declaratory judgment that the initiative did not apply to fees exacted in the context of voluntary transactions, such as when a utility customer requests service or a public housing tenant contracts for a rental unit. This court rejected the argument, noting that the dictionary definition of "impose" is not inconsistent with, and thus does not restrict, the initiative's broad definition of "tax":

> "Impose" has as its ordinary meaning "to make, frame, or apply (as a charge, tax, obligation, rule, penalty) as compulsory, obligatory, or enforceable . . . : LEVY . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1136 (1986). "Levy" means "to impose or collect (as a tax or tribute) by legal process or by authority : EXACT . . . ." *Id.* at 1301. These common definitions are broader than the Housing Authority suggests and do not limit the term "tax" to its common meaning.

*Id.* at 221.

■ ■ ¶18 As in *Amalgamated Transit*, here the term "impose" should be given its ordinary, dictionary meaning, not its legal meaning. *See State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990) (nontechnical terms should be given their ordinary meaning) (citing *State v. Olson*, 47 Wn. App. 514, 516-17, 735 P.2d 1362 (1987)). A payment obligation may be "imposed" by contract as well as by superior or unilateral force.

¶19 Moreover, as the petitioners note, a subsection of the statute expressly refers to the imposition of a franchise fee

by contract. RCW 35.21.860(2) allows a municipality to continue to collect franchise fees that were imposed by contract before April 21, 1982. It provides:

Subsection (1) of this section does not prohibit franchise fees *imposed* on an electrical energy, natural gas, or telephone business, *by contract* existing on April 20, 1982, with a city or town, for the duration of the contract, but the franchise fees shall be considered taxes for the purposes of the limitations established in RCW 35.21.865 and 35.21.870 to the extent the fees exceed the costs allowable under subsection (1) of this section.

RCW 35.21.860(2) (emphasis added).

¶20 The petitioners further contend that the Cities' interpretation renders the statute meaningless because a franchise fee can be imposed only by contractual agreement. Indeed, a franchise is a contract. *City of Tukwila v. City of Seattle*, 68 Wn.2d 611, 615, 414 P.2d 597 (1966) (citing 5 EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS §§ 19.39, 19.40 (3d ed. 1949)). A city has statutory authority to "grant" a franchise, not to "require" one. *City of Lakewood v. Pierce County*, 106 Wn. App. 63, 73, 23 P.3d 1 (2001). A " 'city cannot . . . compel the [utility] to accept its terms for the continued occupation of the streets.' " *Gen. Tel. Co. of Nw., Inc. v. City of Bothell*, 105 Wn.2d 579, 586, 716 P.2d 879 (1986) (first alteration in original) (quoting 12 EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 34.51, at 137 (3d ed., rev. vol. 1970)). Thus, generally, a franchise fee is a bargained-for exchange by the franchisee for a privilege that could otherwise be denied to it.

¶21 We do not believe that the legislature intended to allow cities to circumvent the statutory prohibition on franchise fees by contractual agreement. The statute expressly restricts a city's power of contract by prohibiting a city from imposing a franchise fee. Thus, petitioners are correct that the Cities may not avoid the statutory prohibition on franchise fees simply by obtaining a franchisee's voluntary assent. This does not resolve the core issue of this case, however, which is whether the contractual payment

provision is a "franchise fee or any other fee or charge" for purposes of RCW 35.21.860(1).

¶22 A franchise is " 'the right of a public utility to make use of the city streets for the purpose of carrying on the business in which it is generally engaged, that is, of furnishing service to members of the public generally.' " *Lakewood*, 106 Wn. App. at 73-74 (quoting *Wash. Fruit & Produce Co. v. City of Yakima*, 3 Wn.2d 152, 157-58, 100 P.2d 8, *adhered to on reh'g*, 3 Wn.2d 167, 103 P.2d 1106 (1940)). The grant of a franchise is a special privilege that allows particular individuals to profit from the use of the city streets in a manner not generally available to the public as a common right. *State ex rel. Pac. Tel. & Tel. Co. v. Dep't of Pub. Serv.*, 19 Wn.2d 200, 278, 142 P.2d 498 (1943); 12 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 34.2, at 13 (3d ed., rev. vol. 2006).

■ ¶23 The power to grant a franchise is a sovereign power that resides in the state but may be delegated to cities. *Gen. Tel. Co. of Nw.*, 105 Wn.2d at 584 (citing *Neils v. City of Seattle*, 185 Wash. 269, 274-75, 53 P.2d 848 (1936)); 12 MCQUILLIN, *supra*, § 34.10, at 51. The legislature has granted authority to cities to grant a nonexclusive franchise. RCW 35A.47.040.[3] A city acts in a governmental capacity in granting a franchise. *City of Spokane v. Spokane Gas & Fuel Co.*, 175 Wash. 103, 107, 26 P.2d 1034 (1933). A city may refuse to grant a franchise at all. *Id.* Once granted, however, a franchise is a contract which is binding on both the grantor and the grantee. *Tukwila*, 68 Wn.2d at 615; 12 MCQUILLIN, *supra*, § 34.5, at 29.

---

[3] *"Every code city shall have authority* to permit and regulate under such restrictions and conditions as it may set by charter or ordinance and *to grant nonexclusive franchises for the use of public streets, bridges or other public ways,* structures or places above or below the surface of the ground for railroads and other routes and facilities for public conveyances, *for poles, conduits, tunnels, towers and structures, pipes and wires and appurtenances thereof for transmission and distribution of electrical energy,* signals and other methods of communication, for gas, steam and liquid fuels, for water, sewer and other private and publicly owned and operated facilities for public service. The power hereby granted shall be in addition to the franchise authority granted by general law to cities." RCW 35A.47.040 (emphasis added).

¶24 Because a franchise is a valuable property right, it is a privilege for which cities, historically, have exacted compensation in the form of free services or a cash payment. *Pac. Tel. & Tel. Co.*, 19 Wn.2d at 278; 12 McQuillin, *supra*, § 34.54, at 207. A franchise fee is "in the nature of rental for the use and occupation of the streets." *Spokane*, 175 Wash. at 108 (citing *St. Louis v. W. Union Tel. Co.*, 148 U.S. 92, 13 S. Ct. 485, 37 L. Ed. 380 (1893)); *see also* Gardner F. Gillespie, *Rights-of-Way Redux: Municipal Fees on Telecommunications Companies and Cable Operators*, 107 Dick. L. Rev. 209 (2002) (historical overview of municipal practices and justifications for imposing franchise fees). A city may require compensation for the use of the public streets as a condition for granting a franchise, unless forbidden by statute or contrary to public policy. 12 McQuillin, *supra*, § 34.52, at 200.

¶25 RCW 35.21.860 expressly forbids a city from imposing a "franchise fee" on an electric utility. Thus, a city may not exact compensation in the nature of a rental fee from an electric utility for use of the public right-of-way.

¶26 The respondents contend, however, that the contractual payment provision in this case is not a "franchise fee" for purposes of RCW 35.21.860(1). The character of a charge is determined by the nature of the right for which it was to be paid. *Spokane*, 175 Wash. at 108. A franchise fee is a payment exacted in exchange for the right and privilege to use and occupy the streets. *Id.* at 109. Here, respondents argue, the payments are not franchise fees because they are not made in exchange for the privilege to use the right-of-way. Rather, the payments are consideration for the Cities' agreement not to compete with SCL.

¶27 Respondents point to *Washington Fruit & Produce* as instructive. In that case, residents of Yakima challenged the validity of a contract between the city and a private electric utility whereby the utility agreed to provide all public street lighting during a 10 year period for a stipulated rate. Under the city charter, any "franchise *or right to occupy or use the streets*" must be granted by ordinance,

provide for reasonable compensation to the city, and be approved by a majority of the voters. *Wash. Fruit & Produce*, 3 Wn.2d at 155. The city commissioners approved the contract without complying with any of those provisions. The petitioners argued that the contract was, in fact, a franchise because it granted the right to use or occupy the streets. In rejecting the argument, this court stated:

> While it is unquestionably true that, by definition, a franchise is said to be the privilege of using the streets, it does not necessarily follow that the converse is true, and that *any* right or privilege to use public streets, regardless of the manner in which it arises or regardless of its purpose, is a franchise.

*Id.* at 157.

¶28 This court concluded that in contracting with the utility, the city was not exercising its sovereign power to grant a franchise but was exercising its proprietary power to contract for the sale and delivery of light or power. The utility's right to use the streets was merely an implied right arising under the contract, and not a franchise or a "right to occupy or use the street." Accordingly, the provisions of the city charter governing franchises were irrelevant. *See also Winkenwerder v. City of Yakima*, 52 Wn.2d 617, 630, 328 P.2d 873 (1958) (city contract for placement of advertising on parking meters not subject to city charter governing a " 'franchise or right to occupy or use the streets, highways, bridges, or public places of the city' "); *N. States Power Co. v. City of Granite Falls*, 186 Minn. 209, 242 N.W. 714 (1932) (contract requiring private utility to erect transmission lines over city streets was not a franchise because the city was acting in its proprietary, not governmental, capacity and thus restrictions in city charter governing franchises held irrelevant).

¶29 Just as not every right or privilege to use public streets is a "franchise," not every payment received from a franchisee is a "franchise fee." We agree with respondents that the payments at issue in this case are not franchise fees because they are not made in exchange for the privilege to use the streets.

¶30 However, the statute forbids a city from imposing not only a "franchise fee" but also "any other fee or charge of whatever nature or description." RCW 35.21.860(1). The next issue we must decide is whether "any other fee or charge" includes a contractual debt incurred in exchange for valuable consideration independent from a franchisee's right to occupy the streets.

¶31 The meaning of words in a statute is not gleaned from those words alone but from " 'all the terms and provisions of the act in relation to the subject of the legislation, the nature of the act, the general object to be accomplished and consequences that would result from construing the particular statute in one way or another.' " *State v. Krall*, 125 Wn.2d 146, 148, 881 P.2d 1040 (1994) (quoting *State v. Huntzinger*, 92 Wn.2d 128, 133, 594 P.2d 917 (1979)). When a statute contains provisos and exceptions, we may infer the intended scope of an enacting clause from the character of the provisos or exceptions pertaining to it. *Monroe Calculating Mach. Co. v. Dep't of Labor & Indus.*, 11 Wn.2d 636, 644, 120 P.2d 466 (1941).

¶32 The statute here enumerates five exceptions to the prohibition on franchise fees and "any other fee or charge":

(a) A tax authorized by RCW 35.21.865 may be imposed;

(b) A fee may be charged to such businesses or service providers that recovers actual administrative expenses incurred by a city or town that are directly related to receiving and approving a permit, license, and franchise, to inspecting plans and construction, or to the preparation of a detailed statement pursuant to chapter 43.21C RCW;

(c) Taxes permitted by state law on service providers;

(d) Franchise requirements and fees for cable television services as allowed by federal law; and

(e) A site-specific charge pursuant to an agreement between the city or town and a service provider of personal wireless services acceptable to the parties for:

(i) The placement of new structures in the right of way regardless of height, unless the new structure is the result of a

mandated relocation in which case no charge will be imposed if the previous location was not charged;

(ii) The placement of replacement structures when the replacement is necessary for the installation or attachment of wireless facilities, and the overall height of the replacement structure and the wireless facility is more than sixty feet; or

(iii) The placement of personal wireless facilities on structures owned by the city or town located in the right of way. However, a site-specific charge shall not apply to the placement of personal wireless facilities on existing structures, unless the structure is owned by the city or town.

RCW 35.21.860(1).

¶33 All of the exceptions listed in the statute limit the taxes and fees that a city may impose on a franchisee in exercising its governmental powers of taxation and regulation. Thus, the statutory language "any other . . . charge of whatever nature or description" must be understood in this context.

¶34 Subsection (2) of the statute expressly allows cities to continue to collect franchise fees imposed by contracts entered before April 21, 1982, provided that *the franchise fees shall be considered taxes* for the purposes of the limitations established in RCW 35.21.865 and 35.21.870 to the extent the fees exceed the costs allowable under subsection (1) of this section." RCW 35.21.860(2) (emphasis added). By equating franchise fees and taxes, and limiting the cumulative charges that a city may impose at six percent, the legislature indicated its intent to prevent cities from burdening electric utilities with multiple exactions and thus impairing their ability to provide cost-effective service to utility customers. But the legislature did not intend to prevent cities from conferring a special benefit on an electric utility in exchange for negotiated consideration.

¶35 Presumably, such a voluntary exchange will enhance, not impair, a utility's ability to provide cost-effective service to its customers because a utility is governed by market forces and will not agree to make payments unless it expects to yield a profitable return. *See City of Tacoma v.*

*Taxpayers of City of Tacoma*, 108 Wn.2d 679, 690, 743 P.2d 793 (1987) ("[A] municipal utility, like any other business, is subject to market forces, and thus has disincentives to investing its own money in measures that are . . . not cost effective."). Indeed, as we discuss further below, SCL made a reasonable business decision in agreeing to the payments in exchange for the Cities' agreement not to compete, as the potential loss of its ratepayer base threatened to undermine its ability to provide low-cost, efficient service to its remaining customers.

¶36 Two additional principles of statutory construction are germane to our analysis. First, a doubtful term or phrase in a statute or ordinance takes its meaning from associated words and phrases. *State v. Rice*, 120 Wn.2d 549, 560-61, 844 P.2d 416 (1993); *City of Mercer Island v. Kaltenbach*, 60 Wn.2d 105, 109, 371 P.2d 1009 (1962) (citing *Winkenwerder*, 52 Wn.2d 617); 2A NORMAN J. SINGER, STATUTES & STATUTORY CONSTRUCTION § 47.16 (6th ed. 2000). When two or more words are grouped together and have a similar but not equally comprehensive meaning, the general word is limited and restricted by the special word. 2A SINGER, *supra*, § 47.16. Here, the phrase "any other fee or charge" must be interpreted in association with "franchise fee" and the enumerated exceptions to the prohibition on municipal exactions from franchisees.

¶37 The fees and charges imposed on franchisees have been variously described and justified as a franchise fee, license fee, permit fee, toll, user fee, rental fee, and a regulatory fee. 12 McQUILLIN, *supra*, § 34.1, at 8; *see also* Gillespie, *supra*, 107 DICK. L. REV. 209 (historical overview of municipal exactions from franchisees). Generally, a city may impose a license fee in the exercise of its police powers in addition to whatever franchise fee may be imposed by contract. *Tukwila*, 68 Wn.2d at 616-17; 12 McQUILLIN, *supra*, § 34.99 ("Where the franchise does not grant the privilege of using the streets, free from any license, the exaction of one does not impair the obligation of the contract."); 12 McQUILLIN, *supra*, § 34.101, at 354 (license fees

are presumptively reasonable). The statutory language "or any other fee or charge of whatever nature or description," read in conjunction with "franchise fee" and the statutory exceptions, reflects the legislature's intent to prevent a city from imposing additional fees and charges on franchisees as a condition for using the right-of-way, regardless of its nominal designation, other than those specifically enumerated.

¶38 The phrase "for use of the right of way" also provides significant context for interpreting "any other fee or charge." In 2000, the legislature amended RCW 35.21-.860(1), adding the phrase "or service provider for use of the right of way." LAWS OF 2000, ch. 83, § 8. The ratepayers contend that "for use of the right of way" does not restrict the meaning of "any other fee or charge" because it modifies only "service provider," not "light and power, or gas distribution businesses . . . or telephone business." We disagree. That the legislature added the phrase "for use of the right of way" to modify "service provider" but not "the light and power, or gas distribution businesses . . . or telephone business" is readily understandable given that "service provider" includes telecommunications providers that may or may not occupy the public streets. RCW 35.99.010(6), (7).

¶39 In contrast, the other specifically named businesses necessarily occupy the public streets in the course of their business. The phrase "for use of the right of way" clarifies that the statute restricts the imposition of fees on service providers as franchisees, a clarification that was unnecessary in the case of the other businesses mentioned. As a whole, the statute pertains to fees and charges imposed in the exercise of governmental powers of taxation and regulation over a franchisee, rather than in the exercise of a city's proprietary powers unrelated to the use of the right-of-way.

¶40 A closely related maxim of statutory construction, ejusdem generis, provides that when general words follow specific words, the general words are construed to embrace a similar subject matter. *Dean v. McFarland*, 81 Wn.2d 215,

221, 500 P.2d 1244 (1972); 2A SINGER, *supra*, § 47.17. Here, the phrase "any other fee or charge of whatever nature or description," read literally, as the ratepayers would have us do, renders "franchise fee" superfluous. Had the legislature intended "any other fee or charge of whatever nature or description" to be understood in an unrestricted sense, it would have no need to specifically mention "franchise fee." Not all payments received by a city from an electric utility fall within the rubric of a "fee or charge" for purposes of the statute.

¶41 In undertaking a plain language analysis, we avoid interpreting a statute in a manner that leads to unlikely, strained, or absurd results. *Berrocal v. Fernandez*, 155 Wn.2d 585, 590, 121 P.3d 82 (2005) (quoting *Burton v. Lehman*, 153 Wn.2d 416, 423, 103 P.3d 1230 (2005)). It would be unreasonable and absurd to suppose that the legislature intended to prohibit a city from receiving any payment in exchange for a special benefit conferred upon an electric utility independent from the right to use the public streets. Under the petitioners' interpretation, a city would be prohibited from charging an electric utility for water supplied through a municipal water utility or any other commodity fee in exchange for goods or services provided to the business. A more reasonable interpretation is that the legislature intended the language to encompass any gov-ernmental charge, but not proprietary charges independent from the right to use the streets.

¶42 When a city imposes taxes and regulatory fees, it acts in a sovereign rather than a proprietary capacity. *City of Tacoma v. Hyster Co.*, 93 Wn.2d 815, 821, 613 P.2d 784 (1980). The statute limits the taxes and regulatory fees a municipality may impose, but not commodity charges for services unrelated to the right-of-way, such as water or sewer fees, or garbage disposal fees. *Twitchell v. City of Spokane*, 55 Wash. 86, 89, 104 P. 150 (1909) (" 'Water rates paid by consumers are in no sense taxes, but are nothing more than the price paid for water as a commodity. The obligation to pay for the use of water rests either on express

or implied contract on the part of the consumer to make compensation for water which he has applied for and received.' " (quoting 30 THE AMERICAN AND ENGLISH ENCYCLO-PAEDIA OF LAW 422 (2d ed. 1905))). The payments at issue in this case are not governmental charges but, like water rates, are proprietary charges voluntarily incurred in the context of a proprietary transaction.

¶43 In sum, the effect of the statute is to prevent a city from obtaining valuable consideration in exchange for granting the right to use a public street. Thus, SCL's agreement to pay would be unenforceable for lack of consideration if supported by no more than the Cities' grant of the franchise. This was the situation, for example, in *Farmer v. Columbiana County Telephone Co.*, 72 Ohio St. 526, 74 N.E. 1078 (1905). There, a power utility entered into a franchise agreement with a city whereby the utility agreed to supply free local telephone service and other rate concessions in exchange for the right to build and operate a telephone distribution system within the county. State law authorized local authorities to grant franchises, provided that " 'nothing in this section shall be so construed as to authorize any municipal corporation *to demand or receive any compensation* for the use of a street, alley or public way, beyond what may be necessary to restore the pavement to its former state of usefulness.' " *Id.* at 531 (emphasis added) (quoting former OHIO REV. STAT. § 3461). The Ohio Supreme Court held that the contract failed for lack of consideration because "the municipality possessed nothing in the way of a valuable right to bestow upon the Company. Hence the promises of the Company to do what it was not, and could not by the city be required to do, was a naked promise, without consideration . . . . [T]he City had nothing in the way of rights or special benefits to give away, or barter away." *Id.* at 532-33; *see also City of Hawarden v. US W. Commc'ns, Inc.*, 590 N.W.2d 504 (Iowa 1999) (invalidating a city ordinance imposing a percentage-of-revenue "user fee" for a utility right-of-way where state law authorizes only

regulatory fees); *Am. Tel. & Tel. Co. v. Vill. of Arlington Heights*, 156 Ill. 2d 399, 620 N.E.2d 1040, 189 Ill. Dec. 723 (1993) (invalidating a "toll" for the right to lay 85 miles of underground fiber optic cable where state law disallows cities from collecting rent for the use of the right-of-way).

¶44 Similarly, in *General Telephone Co. of Northwest*, 105 Wn.2d 579, the cities of Bothell and Renton attempted to extract concessions from a utility in violation of state law. The cities granted a franchise to a telephone utility to maintain a telephone system in each of those cities. The cities subsequently enacted ordinances requiring the utility to convert aerial facilities into underground facilities at its own expense. The ordinances conflicted with tariffs filed by the utility, which imposed undergrounding costs on the party that requested the service. Because the tariffs had "the force and effect of law," this court concluded that the ordinances were preempted and, thus, invalid. *Id.* at 585. In this case, by contrast, the Cities have not sought to impose a franchise fee or other fee or charge in violation of state law but have negotiated a mutually beneficial exchange of consideration with SCL.

¶45 The ratepayers contend, though, that the contractual payment provision violates the principle that parties cannot lawfully agree to do by contract that which is prohibited by law. In support, they rely on *Nolte v. City of Olympia*, 96 Wn. App. 944, 982 P.2d 659 (1999). In *Nolte*, a developer entered a "utility extension agreement" with the city of Olympia, which required the developer to pay impact fees in exchange for the right to connect to the city's water and sewer system. The developer challenged the fees as an impermissible imposition. State law allows a city to impose impact fees as a condition of a development permit. However, a city has no authority to issue a development permit for a project outside its borders. Nevertheless, the city adopted an ordinance requiring the imposition of impact fees as a condition for providing utility service outside the city. The Court of Appeals held that the ordinance conflicted with state law and was unenforceable because the city lacked statutory authority to impose the impact fees.

¶46 The Court of Appeals rejected the city's argument that it could impose the fees in its capacity as a utility provider, apart from its role as a municipality. The statute at issue provided that " 'no county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings, commercial buildings, industrial buildings, or on any other building or building space or appurtenance thereto, or on the development, subdivision, classification, or reclassification of land.' " *Id.* at 954-55 (quoting RCW 82.02.020). The Court of Appeals reasoned, "[b]y its plain terms, this statute governs the City in all of its roles. It restricts the City to imposing impact fees under RCW 82.02.050-.090, and thus it does not authorize the fees imposed here." *Id.* at 955.

¶47 The ratepayers' reliance on *Nolte* is misplaced. In *Nolte*, the ordinance at issue required the imposition of impact fees expressly disallowed by statute. *Nolte* would be on point if the Cities had attempted to enforce ordinances requiring a franchisee to provide "reasonable compensation" as a condition for the grant of a franchise. The city of Shoreline, for instance, has such an ordinance but did not apply it to SCL.[4] Instead, Shoreline negotiated the contractual payment provision in exchange for the city's promise not to form an electric utility. Further, in *Nolte*, the city's imposition of the impact fee clearly fell within the statutory prohibition on "any tax, fee, or charge, either direct or indirect." In this case, the payments at issue are not a franchise fee because they are not in exchange for use of the right-of-way, and they are not a "fee or charge of whatever nature or description" within the meaning of the statute because they are supported by independent valuable consideration unrelated to the city's governmental powers of taxation and regulation.

---

[4] Shoreline Municipal Code section 12.25.090(A) provides, "All franchise agreements executed by the city shall include terms requiring a grantee to pay a fee in consideration of the privilege granted under a franchise agreement to use the public right-of-way and the privilege to construct and/or operate in the city."

¶48 The Cities have the authority to grant nonexclusive franchises for the use of public streets to an electric utility. RCW 35A.47.040. The Cities also have the authority to acquire and operate electric utilities. RCW 35A.80.010; RCW 35.92.050; *Taxpayers of Tacoma*, 108 Wn.2d at 692. Whereas the power to grant a franchise is a governmental power, the power to form an electric utility is a proprietary power. *Okeson*, 150 Wn.2d at 550. These powers are independent of one another. The Cities contend that their surrender of the right to own and operate an electric utility is valid consideration for the payments received from SCL. We agree.

¶49 When a municipality is exercising its governmental powers, "less opportunity exists for invoking the doctrines of liberal construction and of implied powers." *Taxpayers of Tacoma*, 108 Wn.2d at 694. But a municipality may exercise its proprietary powers " 'very much in the same way as a private individual.' " *Id*. (quoting *Pub. Util. Dist. No. 1 of Pend Oreille County v. Town of Newport*, 38 Wn.2d 221, 227, 228 P.2d 766 (1951)). In exercising its proprietary power, a municipality may not act beyond the purposes of the statutory grant of power or contrary to express statutory or constitutional limitations. But a municipality has broad discretion to operate within those parameters, and its choices will be upheld on judicial review unless a particular action or contract is arbitrary and capricious. *Id*. at 695.

¶50 The purpose of RCW 35.92.050 is to grant municipalities the power to conduct and operate utilities. *Id*. at 696. The underlying policy is the belief that municipalities can provide more cost effective and efficient electrical service. *Id*. (citing 3 JOHN F. DILLON, COMMENTARIES ON THE LAW OF MUNICIPAL CORPORATIONS § 1291, at 2094 (5th ed. 1911)).

¶51 The Cities also have the authority to enter into contracts. *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 383, 858 P.2d 245 (1993); RCW 35A.11.010. The power to contract, like other specific and general powers conferred upon optional code cities, "shall be liberally construed in favor of the munici-

pality." RCW 35A.01.010. A city may enter into any contract so long as it does not conflict with the constitution, a statute, or a city's own charter or ordinances. *See* 10 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 29.05, at 255 (3d ed., rev. vol. 1990); *Branson v. Port of Seattle*, 152 Wn.2d 862, 871, 101 P.3d 67 (2004) ("There is a 'range of reasonableness within which a municipality's manner and means of exercising [its] powers will not be interfered with or upset by the judiciary.' " (alteration in original) (quoting 2A EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 10.18.10, at 366 (3d ed., rev. vol. 1996))). When entering into a contract in a proprietary, as opposed to a governmental, capacity, a municipality stands on the same footing as a similarly situated private party. 10 MCQUILLIN, *supra*, § 29.05, at 255. When acting in a proprietary capacity, "a municipal corporation acts as the proprietor of a business enterprise for the private advantage of the city and may exercise its business powers in much the same way as a private individual or corporation." *Hite v. Pub. Util. Dist. No. 2 of Grant County*, 112 Wn.2d 456, 459, 772 P.2d 481 (1989). " 'In the erection and operation of gas works, electric light plants, waterworks and the like, as well as in contracting for such service and in attending to matters of local interest merely for the special benefit and advantage of the city and its citizens, a municipal corporation acts as a business concern.' " *Pub. Util. Dist. No. 1 of Pend Oreille County*, 38 Wn.2d at 227-28 (quoting 1 OSCAR L. POND, A TREATISE ON THE LAW OF PUBLIC UTILITIES § 5, at 15 (4th ed. 1932)).

¶52 In *Hite*, this court held that a public utility district had implied authority to secure a contractual lien provision with a utility customer even though the city could not unilaterally impose such a lien by ordinance. The court noted that the power to contract is a "proprietary power that may be construed broadly." *Hite*, 112 Wn.2d at 460. Generally, when contracting in its proprietary capacity, a city " 'ha[s] a right to insert in the contract any condition or conditions (not in themselves unlawful) which might be deemed beneficial or advantageous to it or to its citizens.' " *Id.* at 463 (quoting *Stover v. Winston Bros. Co.*, 185 Wash.

416, 422, 55 P.2d 821, *appeal dismissed*, 299 U.S. 508 (1936)).

¶53 The record establishes that SCL received significant benefits in exchange for its promise to pay the Cities a portion of the utility revenues received from suburban customers. At the time it entered into the agreements, SCL faced considerable uncertainty regarding its ability to retain a stable ratepayer base due to a trend toward deregulation of the industry together with the incorporation of new cities. Deregulation could have resulted in the uncoupling of the distribution and power portions of SCL's business, potentially allowing alternate providers to provide power to existing SCL retail customers. Upon incorporation, cities could grant a franchise to another electric utility or create a municipal utility, resulting in the loss of suburban customers from SCL's ratepayer base. The resulting uncertainty was particularly problematic for SCL, which as an electric utility is a capital intensive enterprise. As explained by Tacoma Power's superintendent, Steven Klein, who entered into a similar contractual arrangement with University Place and the city of Lakewood:

> A stable and robust customer base is critical in order to produce a steady revenue stream to pay the fixed costs associated with the intensive capital investments that are typical in the electric utility industry. Direct loss in customer base and associated revenue reduction can cause the remaining customers' rates to increase in order to cover the fixed costs associated with long-term investments and commitments. Also the typical high debt levels associated with electrical utilities require stable customer revenues to establish satisfactory ratings from debt rating agencies to enable borrowing at the lowest interest rates.

CP at 1879-80.

¶54 In analyzing the potential impacts of the loss of suburban customers, SCL concluded that the net result likely would be negative for the remaining customers. With a diminished ratepayer base, fixed costs would be spread among fewer people. In addition, a loss of suburban cus-

tomers could adversely affect SCL's renewal of its federal operating license for Boundary Dam, SCL's largest and cheapest generating resource, which depends, in part, on the size of SCL's ratepayer base. Moreover, the loss of a significant customer base could jeopardize SCL's ability to purchase power from the Bonneville Power Administration at favorable rates. Thus, the ability to secure a stable customer base had significant value to SCL. SCL made a reasonable business decision to exchange a percentage of its revenue in order to reduce the risk that it may lose a portion of its service territory through competition with municipally-owned electric utilities. SCL's decision to make the payments falls within the range of reasonableness and was not arbitrary or capricious.

¶55 The Cities, in turn, forfeited a significant right in exchange for the payments received from SCL. A city may, but is not required to, agree not to compete with a franchisee during the life of a franchise. *See Walla Walla City v. Walla Walla Water Co.*, 172 U.S. 1, 19 S. Ct. 77, 43 L. Ed. 341 (1898) (city's promise not to compete with franchisee does not run afoul of statutory prohibition on exclusive franchises and may not be impaired by subsequent legislative enactment); *see also W. Tenn. Power & Light Co. v. City of Jackson*, 21 F. Supp. 57, 60 (W.D. Tenn. 1937) ("[A] public utility corporation holding a municipal public service franchise . . . cannot prevail in a complaint against the action of the municipality in entering upon competitive business with the plaintiff public utility corporation, where no express agreement has been made by the municipality not to do so."), *aff'd*, 97 F.2d 979 (6th Cir. 1938). The grant of a nonexclusive franchise does not prevent a city from operating a competing utility. *Cf. City of Vicksburg v. Vicksburg Waterworks Co.*, 202 U.S. 453, 465, 26 S. Ct. 660, 50 L. Ed. 1102 (1906) (city's erection of a competing waterworks unconstitutionally impaired franchisee's contractual right to an *exclusive* franchise). "[U]nless the city has excluded itself in plain and explicit terms from competition with the Water-Works Company during the period of this contract it

cannot be held to have done so by mere implication." *Id.* at 469; *see also Pub. Util. Dist. No. 1 of Pend Oreille County,* 38 Wn.2d at 226 (nothing prevents a town from creating a municipal electric utility in an area already served by a public utility district); *Monroe Water Co. v. Town of Monroe,* 126 Wash. 323, 329, 218 P. 6 (1923) ("certainly where the franchise itself provides that the privileges and rights granted thereunder are not exclusive, the city has the right and authority to construct a municipally-owned water plant without in anywise violating the terms of the franchise").

¶56 Thus, the Cities could have granted a franchise without agreeing not to compete with SCL. Tukwila's 1958 franchise agreement with SCL, for example, did not prohibit Tukwila from forming its own electric utility.

¶57 The power of a local government to form its own electric utility has long been recognized as a valuable right that a city may leverage in order to secure beneficial rates and services for its citizens. In 1932, Franklin D. Roosevelt discussed the importance of community-owned utilities, stating, "the very fact that a community can, by vote of the electorate, create a [utility] of its own, will, in most cases, guarantee good service and low rates to its population. I might call the right of the people to own and operate their own utility something like this: a 'birch rod' in the cupboard to be taken out and used only when the 'child' gets beyond the point where a mere scolding does no good." 1 THE PUBLIC PAPERS AND ADDRESSES OF FRANKLIN D. ROOSEVELT 739 (1938).

¶58 If the Cities had elected to form their own utilities, they would have had greater control over the rates and services available to their residents. In addition, the Cities could have generated revenue for their general funds through the imposition of a utility tax on their own municipal utilities. *See* RCW 35.21.870 (authorizing six percent utility tax); *Samis Land Co. v. City of Soap Lake,* 143 Wn.2d 798, 807, 23 P.3d 477 (2001) (tax revenues may be used for general fund). Thus, a city's right to form its own utility is financially significant. The Cities were entitled to secure consideration in exchange for forbearing from exercising a

valuable legal right. *See Huberdeau v. Desmarais*, 79 Wn.2d 432, 439, 486 P.2d 1074 (1971) (forbearance from a legal right is valid consideration); *Hamer v. Sidway*, 124 N.Y. 538, 27 N.E. 256, 257 (1891) (same).

¶59 The ratepayers contend, though, that the contractual payment agreement is a transparent attempt to circumvent two "legal prohibitions," i.e., the prohibition on one municipality imposing a tax on another municipality and the prohibition on a "franchise fee or any other fee or charge." The ratepayers assert that "it was the legal inability of the suburban cities to impose a utility tax on [SCL] that led to the scheme to raise revenues for those cities through illegal franchise fees instead of illegal taxes." Br. of Appellants at 8-9.

¶60 The ratepayers are correct that in negotiating the agreement, SCL and the Cities assumed that the Cities could not impose either a utility tax or a franchise fee on SCL. The fact that SCL and the Cities contracted around these legal impediments does not, as the ratepayers suggest, raise an inference of bad faith or nefarious purpose.

¶61 It should be noted that the Cities' ability to impose a utility tax on SCL is not, as the ratepayers contend, a settled issue of law. In *King County v. City of Algona*, 101 Wn.2d 789, 681 P.2d 1281 (1984), this court held that the city of Algona could not impose a business and occupation tax on a King County solid waste facility. Relying on *Algona*, the Washington Attorney General's office issued an advisory opinion that a city could not impose a utility tax on another city's electric utility. 1990 Op. Att'y Gen. No. 3. *Algona*, however, arguably is distinguishable on both the facts and the law. In *Algona*, over 90 percent of the utility customers resided outside the city of Algona. Hence, the business and occupation tax the city sought to levy would burden mostly nonresidents. In contrast, a tax imposed on a city's electric utility customers would burden only the city residents. More importantly, *Algona* involved a solid waste facility, the operation of which is a governmental, not a proprietary, activity. In contrast, it is well established that

the operation of an electric utility is a proprietary activity. *Taxpayers of Tacoma,* 108 Wn.2d at 694 ("Actions taken pursuant to RCW 35.92.050 serve a business, proprietary function, rather than a governmental function."). In *Algona,* we concluded that the doctrine of governmental immunity from taxation barred the city of Algona from levying a tax on King County's solid waste facility. Given the factual and legal distinctions between *Algona* and the situation presented here, it is by no means certain, as the ratepayers suggest, that the doctrine of governmental immunity from taxation would prevent the Cities from imposing a utility tax on SCL. *See, e.g., Town of Mulga v. Town of Maytown,* 502 So. 2d 731 (Ala. 1987) (municipal corporation engaged in the proprietary activity of selling gas to residents outside the city limits subject to excise tax imposed by neighboring municipality); 16 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 44.60 (3d ed., rev. vol. 2003) (noting conflict in decisions on the issue of whether a municipally-owned electric utility is exempt from taxation).

¶62 Seattle's authority to impose a utility tax on revenues generated from suburban customers is supported by *Burba v. City of Vancouver,* 113 Wn.2d 800, 783 P.2d 1056 (1989). There, we held that a city may impose a utility tax on revenue received from customers served outside the city limits. However, the fact that Seattle imposes such a tax does not necessarily prevent the Cities from doing likewise. It is well established that " '[t]here is no constitutional prohibition against double taxation, as applied to excise taxes.' " *City of Seattle v. Paschen Contractors, Inc.,* 111 Wn.2d 54, 60, 758 P.2d 975 (1988) (quoting *Drury the Tailor v. Jenner,* 12 Wn.2d 508, 514, 122 P.2d 493 (1942)); *Tex. Co. v. Cohn,* 8 Wn.2d 360, 386, 112 P.2d 522 (1941); *Supply Laundry Co. v. Jenner,* 178 Wash. 72, 79, 34 P.2d 363 (1934). We do not, of course, decide the issue here. We merely observe that the Cities' ability to impose a utility tax on SCL is an unresolved question of law. The fact that both SCL and the Cities elected to contract around this legally uncertain issue does not demonstrate bad faith by any of

the parties. Certainly, the legislature intended to allow cities to obtain a portion of the revenues generated by power utility customers within their jurisdiction. *See* RCW 35.21.870 (authorizing six percent utility tax). Thus, the Cities' desire to recover a portion of revenues earned by SCL from the Cities' residents does not render their agreement with SCL illegal.

## CONCLUSION

¶63 RCW 35.21.860 prohibits a municipality from imposing "a franchise fee or any other fee or charge of whatever nature or description" on an electric utility. We hold that SCL's agreement to pay the Cities a percentage of utility revenues SCL receives from the Cities' residents does not fall within the statutory prohibition because the Cities did not impose the payment provision in exercising their governmental powers of taxation and regulation. Rather, the payments constitute valid consideration in exchange for the Cities' promise to forbear from entering into competition with SCL. We affirm the summary judgment order of dismissal.

C. JOHNSON, BRIDGE, CHAMBERS, OWENS, and FAIRHURST, JJ., concur.

¶64 J.M. JOHNSON (dissenting) — The legislature has decreed that "[n]o city or town may impose a franchise fee or *any other fee or charge of whatever nature or description* upon" an electric utility, except in limited circumstances not applicable here. RCW 35.21.860(1) (emphasis added). Seattle City Light (SCL) is such an electric utility.[5] The cities of Burien, Lake Forest Park, SeaTac, Shoreline, and Tukwila (Cities) clearly violated this prohibition when they imposed a six percent fee as a condition of each of their franchise agreements with SCL. Yet, the majority would

---

[5] SCL is a "light and power business," as defined in RCW 82.16.010(5), for purposes of RCW 35.21.860.

uphold the Cities' actions and allow this six percent charge to be imposed—ultimately as a tax on consumers. I disagree with the majority's attempt to force an unduly narrow construction on the unambiguous language of RCW 35.21-.860, which plainly prohibits the Cities' conduct. Accordingly, I dissent.

¶65 As an initial matter, I concur in the majority's conclusion that to "impose" a "franchise fee or any other fee or charge" within the meaning of RCW 35.21.860(1), a city or town need not exert unilateral force, by, for example, exercising its tax powers. Majority at 141. Rather, such fees or charges may be "imposed" by contract, or voluntary agreement. *Id*. Likewise, I agree with the majority's determination that the charges at issue here do not constitute "franchise fees," as defined by Washington law. Majority at 142. However, I disagree with the majority's conclusion that the charges imposed by the Cities are not "any other fee or charge of whatever nature or description" prohibited by RCW 35.21.860(1). Majority at 153. The Cities' charges are clearly forbidden under the plain meaning of this statutory language. Therefore, I dissent.

¶66 As indicated by the majority, this case turns on an issue of statutory interpretation. Majority at 140. The goal of statutory interpretation is to "ascertain and give effect to the legislature's intent and purpose." *In re Parentage of J.M.K.*, 155 Wn.2d 374, 387, 119 P.3d 840 (2005). The primary source to be used is the plain language of the statute. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003) (citing *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 19, 978 P.2d 481 (1999)). If the plain language of the statute is unambiguous, then this court's inquiry is at an end. *Id*. The statute is to be enforced in accordance with its plain meaning. *Id*.

¶67 The terms "fee" and "charge" are not defined in RCW 35.21.860 or in any related statutory provision. As nontechnical words, these terms are to be given their plain, dictionary meanings. *State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990) (citing *State v. Olson*, 47 Wn. App. 514,

516-17, 735 P.2d 1362 (1987)). According to the dictionary, "fee" means a "fixed charge," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 833 (2002), while "charge" means an "expenditure or incurred expense." *Id.* at 377. Thus, in addition to prohibiting franchise fees, RCW 35.21.860(1) prohibits the imposition of any other fixed charge, expenditure, or incurred expense, of "whatever nature or description," upon a light and power business. There can be no serious doubt that by requiring SCL to pay a fixed fee of six percent of its revenues as part of each of their franchise agreements, the Cities violated the plain meaning of RCW 35.21.860(1). Because the majority holds to the contrary, I dissent.

¶68 The majority primarily attempts to support its holding by applying an unduly narrow interpretation to the phrase "any other fee or charge of whatever nature or description." RCW 35.21.860(1). First, the majority suggests that the meaning of this phrase must be limited to other fees or charges that a "city may impose . . . in exercising its governmental powers of taxation and regulation." Majority at 147. The majority supports this assertion by reference to five exceptions to RCW 35.21.860(1), found at RCW 35.21.860(1)(a)-(e). Majority at 146-47. Those exceptions generally reference taxes and regulatory fees, not voluntary exchanges of valuable consideration. Thus, the majority concludes, such voluntary exchanges must not come within the scope of RCW 35.21.860(1)'s prohibition. Majority at 147.

¶69 However, the majority's reasoning here is difficult to reconcile with its earlier holding that the plain meaning of "impose" extends beyond the imposition of taxes and the like to include voluntarily assumed payment obligations. Majority at 141. If, as the majority concedes, a franchise fee "imposed" by contract comes within the prohibition of RCW 35.21.860(1), then "any other fee or charge of whatever nature or description" similarly imposed must also, logically, be covered.

¶70 Furthermore, the majority's attempt to limit RCW 35.21.860(1)'s prohibition to other taxes or regulatory fees is belied by the very language that the majority purports to be interpreting. RCW 35.21.860(1) plainly provides that its prohibition extends to "any other fee or charge *of whatever nature or description.*" (Emphasis added.) If the legislature meant to limit the scope of RCW 35.21.860(1)'s prohibition to other taxes or regulatory fees, then it could easily have written the statute accordingly. That the legislature did not use such limited language indicates that it did not intend such a limited meaning. *See Morgan v. Johnson*, 137 Wn.2d 887, 891-92, 976 P.2d 619 (1999) (" '[T]he court should assume that the legislature means exactly what it says.' " (quoting *State v. McCraw*, 127 Wn.2d 281, 288, 898 P.2d 838 (1995))).

¶71 Next, the majority suggests that the phrase "any other fee or charge of whatever nature or description" should be construed as limited to fees or charges in the nature of franchise fees, i.e., fees directly related to occupation of the public streets. Majority at 147-49. Again, the majority's narrow reading of the statute cannot be reconciled with the statute's express language. RCW 35.21.860(1) prohibits "any other fee or charge *of whatever nature or description.*" (Emphasis added.) The legislature could easily have written RCW 35.21.860(1) to prohibit "franchise fees or any other *similar* fees or charges." It did not. In fact, the legislature provided to the contrary, expressly enacting a broad prohibition on charges ultimately paid by consumers.

¶72 As support for its conclusion that "any other fee or charge of whatever nature or description" means other charges similar to franchise fees, the majority points to a 2000 amendment to RCW 35.21.860(1), which added the language " 'or service provider for use of the right of way.' " Majority at 149. The majority's reliance on this added language is misplaced. RCW 35.21.860(1) currently provides, in pertinent part:

No city or town may impose a franchise fee or any other fee or charge of whatever nature or description upon the light and power, or gas distribution businesses, as defined in RCW 82.16.010, or telephone business, as defined in RCW 82.04.065, *or service provider for use of the right of way,* except [exceptions not relevant].

(Emphasis added.) The plain language and grammatical structure of this provision demonstrate that the phrase "for use of the right of way" was intended to modify only the term "service provider." RCW 35.21.860(1). Specifically, the use of the word "or" and the placement of commas surrounding the entire phrase "or service providers for use of the right of way" evidences the legislature's intent to limit the impact of this phrase. *Id.* Since "service provider" is expressly defined, for purposes of RCW 35.21.860(1), as a company providing telecommunications or cable television services to the general public, RCW 35.99.010(6),[6] the final phrase of RCW 35.21.860(1) is essentially irrelevant to the present case.

¶73 The majority suggests that the addition of the " 'for use of the right of way' " phrase supports its position because telecommunications providers, unlike the other businesses covered by RCW 35.21.860(1), do not necessarily occupy the public streets. Majority at 149. Thus, the majority claims, the addition of the phrase " 'for use of the right of way' " in relation to telecommunications service providers implies the existence of an otherwise generally applicable limitation on the scope of RCW 35.21.860(1)'s prohibition as to all of the other businesses covered thereby. However, the majority fails to explain why a provider of telecommunications services is more or less likely to occupy a public street than is a telephone business. *Compare* RCW 35.99.010(6), (7) *with* RCW 82.04.065(2), (4). Accordingly, the majority's argument for an implied, general limitation

---

[6] The term "service provider" was added to RCW 35.21.860 by Laws of 2000, ch. 83, § 8. "Service provider" was defined in section 1(6) of that same legislation as a company providing telecommunications or cable television services to the general public. That definition was later codified at RCW 35.99.010(6).

on the scope of RCW 35.21.860(1)'s prohibition based on the language of its 2000 amendment is untenable.

¶74 The majority further attempts to supports its unduly narrow interpretation of RCW 35.21.860(1) by arguing that to interpret the phrase " 'any other fee or charge of whatever nature or description' " in accordance with its plain meaning would be "unreasonable and absurd" because it would "prohibit a city from receiving any payment in exchange for a special benefit conferred upon an electric utility independent from the right to use the public streets." Majority at 149-50. However, the legislature has, appropriately, made this policy choice, concluding that the monetary charges permitted under the exceptions to RCW 35.21.860(1) sufficiently account for municipal needs while maintaining the statute's core protection against burdensome charges to utilities with consequent higher rates for consumers. *See* RCW 35.21-.860(1)(a)-(c) (permissible taxes and fees). It is not for this court to dictate a different policy or take the legislature's place by revising statutory language. Such revision should be proposed to the legislature, not the courts. *State ex rel. Baisden v. Preston*, 151 Wash. 175, 178, 275 P. 81 (1929).

¶75 To further support its contention that the charges imposed by the Cities are permissible despite RCW 35.21-.860(1)'s prohibition on "any other fee or charge of whatever nature or description," the majority relies on a liberal construction of the Cities' proprietary power to form electric utilities. Majority at 154. Of course, the Cities here did not actually form utilities; they were persuaded (in part by these payments) not to do so. More importantly, as the majority concedes, "[i]n exercising its propriety power [to form an electric utility], a municipality may not act . . . contrary to express statutory . . . limitations." Majority at 154. In imposing the charges at issue here, the Cities violated the plain language of RCW 35.21.860(1). Therefore, these charges cannot be justified as valid exercises of the Cities' power to operate electric utilities, no matter how liberally that power is construed.

¶76 The majority similarly cites to the broad power of municipalities to contract in order to support its decision. Majority at 154-55. However, the majority necessarily concedes that this power extends only to making contracts that do not conflict with relevant statutory authority. *Id.* Because RCW 35.21.860(1) specifically prohibits the contractual provisions at issue in this case, those provisions cannot be deemed valid exercises of the Cities' power to contract. That these contracts might be found beneficial to either the Cities and/or SCL does not make them lawful. Majority at 155-58.

¶77 Finally, the majority concludes its analysis by engaging in an unnecessary evaluation of this court's prior decision in *King County v. City of Algona*, 101 Wn.2d 789, 681 P.2d 1281 (1984). Majority at 159-60. While petitioners did contend in their complaint that the charges at issue constituted unconstitutional taxation of another municipality's department, this court granted review solely as to the trial court's grant of summary judgment for the Cities regarding the alleged violation of RCW 35.21.860(1). While acknowledging the limited scope of our review, *see* majority at 139, the majority goes on to analyze and suggest substantial limitations for this court's holding in *Algona*. Majority at 159-60. This portion of the majority's opinion is unhelpful dicta that is inappropriate given the question presented.

CONCLUSION

¶78 In enacting RCW 35.21.860(1), the legislature sought to protect consumers by expressly prohibiting "a franchise fee or any other fee or charge of whatever nature or description" such as the six percent charge here. The majority offers no persuasive rationale for its decision to interpret the language of RCW 35.21.860(1) in a manner that directly conflicts with its plain meaning. I would apply the statute as written by the legislature and hold that the six percent payment obligations imposed by the Cities on

SCL, and ultimately on consumers, are unlawful and invalid. Therefore, I dissent.

ALEXANDER, C.J., and SANDERS, J., concur with J.M. JOHNSON, J.